UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SHERRI BLACK,

        Plaintiff,

v.                                                                              Case No. 1:15-CV-1147

METROPOLITAN LIFE INSURANCE                    HON. GORDON J. QUIST
COMPANY,

        Defendant.

_____/

**OPINION**

Plaintiff, Sherri Black, has sued Defendant, Metropolitan Life Insurance Company (MetLife), pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking review of MetLife's decision to discontinue Black's long-term disability benefits as of December 15, 2014.  Pursuant to the Case Management Order entered on December 15, 2015, MetLife has filed the Administrative Record and the parties have filed cross motions for judgment based upon the Administrative Record in accordance with *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609 (6th Cir. 1998).  For the reasons set forth below, the Court will deny Black's motion, grant MetLife's motion, and affirm MetLife's decision to discontinue benefits.

**I. BACKGROUND**

**A.**    **The Accident**

In 2008, Black was employed as a Senior Human Relations Manager at Visteon Corporation. (ECF No. 9-7 at PageID.1058.)  On July 1, 2008, Black was in her car in the parking lot at work when her car suddenly accelerated, crashed through a brick wall and a six-inch diameter tree, and hit another brick wall.  (ECF No. 9-5 at PageID.920.)  A doctor at the facility examined Black and

drove her home.  The impact from the accident exacerbated preexisting problems that Black had

with her right shoulder, left knee, and neck.  (ECF No. 9-8 at PageID.1133.)  The following day,

Black saw Robert M. Salamon, M.D., of the Orthopedic Institute of Michigan.  Dr. Salamon

examined Black and noted "[m]ultiple soft tissue contusions and injuries with preexisting right

shoulder instability and mild degenerative arthritis of the left knee and contusions as described

above."  (*Id.* at PageID.1134.)  X-rays of Black's neck, right shoulder, and knees showed

degenerative changes.  Black was scheduled for surgery on her right shoulder.  (*Id.* at PageID.1133.)

Black saw Dr. Salamon again on July 16, 2008, complaining of pain in her neck and knees

and pain in her right shoulder that radiated into her right arm and hand.  (*Id.* at PageID.1131.)  Dr.

Salamon ordered MRIs of Black's cervical spine and her right shoulder.  On July 23, 2008, Dr.

Salamon performed surgery on Black's "unstable" right shoulder resulting from "multiple previous

injuries and dislocations."  (ECF No. 9-9 at PageID.1192.)  Dr. Salamon noted osteoarthritis,

damage to the humeral head and the glenoid, and an anterior labral tear.  (*Id.*)  Dr. Salamon saw

Black for a postop examination on July 30, 2008, at which Black reported that her shoulder felt more

stable.  The previous MRI study on Black's cervical spine revealed "a lot of progression of the

degenerative change described at C5-C6."  Dr. Salamon started Black on physical therapy and

disabled her from work.  (*Id.* at PageID.1187.)

**B.      The Policy and MetLife's Approval of Disability Benefits**

At the time of the accident, Black was covered by the Visteon Corporation Disability Income

Insurance: Long Term Benefits Management and Professional Level Core Benefit Plan.  The Plan

is funded by a group disability insurance policy (Policy) issued by MetLife.[1]  (ECF No. 8-1 at

PageID.34–77.)  The Policy delegates discretionary authority to MetLife to construe, interpret,

---

[1]The terms Plan and Policy will be used interchangeably throughout this Opinion.

apply, and administer the Plan.  (*Id.* at PageID.85.)  The Plan is a qualifying "employee welfare

benefit plan" under ERISA.  29 U.S.C. § 1002 (1).

The Policy defines "disabled" or "disability" as:

[D]ue to Sickness or as a direct result of accidental injury:

- You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
- During the first 24 months of Sickness or accidental injury, You are unable to perform each of the material duties of Your own job; and
- After such period, You are unable to perform the duties of any gainful occupation for which You are reasonably qualified taking into account Your training, education and experience.

(*Id.* at Page ID.54.)  Long-term disability benefits (LTD) commence after the completion of the

Elimination Period, which is defined as "the Short Term Disability Maximum Benefit Period." (*Id.*

at PageID.52.)  To establish a claim for LTD benefits, a participant must submit "Proof of

Disability" to Met Life, defined as "[w]ritten evidence satisfactory to Us that a person has satisfied

the conditions and requirements for any benefit [under the Policy]."  (*Id.* at PageID.57, 64.)  A

participant who is determined to be disabled may be required to submit proof of continuing

disability.  (*Id.*)  LTD benefits end the date a participant is "no longer Disabled." (*Id.* at PageID.70.)

On August 5, 2008, MetLife approved Black for short-term disability benefits.  (ECF No.

9-10 at PageID.1290.)   On February 24, 2009, MetLife approved Black for LTD benefits

commencing as of January 23, 2009.  (ECF No. 9-8 at PageID.1157.)  MetLife approved Black for

continuing LTD benefits under the "any gainful occupation" portion of the definition of "disability"

on June 17, 2010.  (ECF No. 9-6 at PageID.976.)  MetLife requested Black to "advise us of any

changes that might affect your benefits, such as a change or improvement in your medical

condition(s), a return to work, or receipt of other income." (*Id.*)

3

C.     **Black's Proof of Continuing Disability**

Following the accident and continuing through 2014, Black continued to receive treatment

from Dr. Salamon, as well as her primary care physician, James Neuenschwander, M.D., and various

specialists.    As permitted under the Policy, MetLife periodically requested updated medical

information from Black and her medical providers.  For example, in May 2010, Dr. Salamon

reported that Black had consulted with two other doctors about neck surgery and noted that Black

was experiencing "bad headaches and memory problems, fatigue, knee pain, [and] right shoulder

pain."  (ECF No. 9-6 at PageID.988.)  Dr. Salamon also reported that he previously performed

arthroscopic surgery on Black's right knee and found "terrible damage" and said that MRIs and x-

rays showed significant arthritis in both knees.  (*Id.*)  About eighteen months later, on October 6,

2011, Dr. Salamon reported that Black was "still miserable" and "having . . . pain in the neck and

shoulder, and her knees."  Black had "marked limitation of right shoulder motion and marked

limitation of neck motion."  Dr. Salamon could only recommend knee replacement to Black, and

refilled her prescriptions and renewed her physical therapy.  (ECF No. 9-5 at PageID.919.)  Dr.

Salamon said that his prognosis remained "extremely guarded" because Black "may well require

multiple operations in the future to manage these accident-related conditions."  (*Id.* at PageID.921.)

On October 18, 2012, in response to MetLife's request for updated information, Black stated that

she was "tak[ing] on-line classes toward masters degree and continuing certifications to have a

purpose."  (*Id.* at PageID.908.)

On July 22, 2014, in response to MetLife's March 24, 2014, request, Dr. Salamon sent

MetLife progress reports from Black's January 15, 2014, and May 23, 2014, visits.  In the January

15, 2015, report, Dr. Salamon noted that Black had seen Dr. Eltahawy, who recommended that

Black consider neck surgery for relief of her cervical spine symptoms.  Black also reported new

symptoms of pain in her right groin, and her right shoulder was getting worse.  (ECF No. 9-4 at

PageID.833.)  On examination, Dr. Salamon noted full range of motion and normal motor strength

in Black's right hip, uncomfortable and limited motion in Black's right knee, and "quite limited"

motion in Black's right shoulder.  Dr. Salamon continued Black's treatment of medication and

physical therapy.  (*Id.*)  The May 23, 2014, progress report showed improvement from the January

examination: "Overall she is doing better.  She is [sic] an excellent therapist whom she thinks is

doing a terrific job.  She still has pain in her right shoulder, her neck, her back, and her knees.  She

is walking better than before.  She has lost some weight."  (*Id.* at PageID.832.)   Physical

examination revealed that Black's "active right shoulder motion is better than it has been" and "[h]er

knees move reasonably well" notwithstanding "a lot of crepitation."[2]  Dr. Salamon continued Black

"with therapy because it is doing so well."  (*Id.*)

Also in 2014, MetLife obtained information from Black's physical therapy provider, Hands

On Center.  A March 9, 2014, report stated:

> Mrs. Sherri Black has received physical therapy as prescribed, consisting of specific
> shoulder and neck mobilizations, myofascial releases, active mobilizing and stability
> ex.  As well as coaching reconditioning, ex.
> Mrs. Black reports 50% reduced pain cervical as well as in the right shoulder.
> Tolerance levels for ex. and ADL levels are improving.  The cervical mobility has
> improved to 90% NL. The shoulder mobility has improved to 160 degr. flexion, 60
> degr. external rotation, 60 degr. internal rotation.  Rotator cuff strength is 4+/5.
> Mrs. Black is making slow but consistent progress in all aspects.  Continuation of the
> current physical therapy is recommended to maximize ROH and restore ADL
> capacity.

(ECF No. 9-4 at PageID.817.)  The assessments in the accompanying progress notes from May 20,

2014, through July 24, 2014, stated "good tol, slowly improving all aspects[;] ROM shoulder well

progressing."  (*Id.* at PageID.819.)

---

[2]Crepitation or crepitus is "[a] grating sound or sensation produced by friction between bone and cartilage or
the fractured parts of a bone."  *See* https://en.oxforddictionaries.com/definition/crepitus.

**D.      MetLife's 2014 Review and Termination of Benefits**

In the fall of 2014, MetLife's Special Investigation Unit requested Ethos Risk Services to perform an Internet Data Investigation of Black's activity on social media websites.  On October 21, 2014, MetLife received the Internet Data Investigation Report containing information for social media cites Facebook, MyLife, Pinterest, Google+, and Linkedin.  (ECF No. 9-3 at PageID.780–88.) The report, based on Black's own postings, disclosed that Black traveled from her residence in Northville, Michigan, to Chicago for dinner with friends on March 6, 2014, and attended a wedding on February 24, 2014.  (*Id.*)  In addition, the report disclosed that Black was enrolled in a doctoral program through the Center for Values-Driven Leadership at Benedictine University in Illinois, with a graduation date of 2016.  The report also indicated that Black had traveled Dubai to present a paper at a conference.  (*Id.*)

Based on the Internet Data Investigation Report, MetLife obtained an updated clinical opinion from MetLife Senior Medical Director David S. Peters, M.D.  Dr. Peters opined on Black's restrictions and limitations as follows:

> [T]here are significant cervical spine MRI findings and mildly decreased shoulder [range of motion]. Dr. Salamon has documented knee crepitation.  Social media sites revealed her to be active and, in my opinion, restricted fulltime (8 hours daily) primarily seated work should be possible while continuing evaluation and treatment of her conditions.  In my opinion, she should not be required to climb ladders and standing/walking should be limited to 20 minutes per hour and to a daily total of 2.5 hours.  She should not be required to work at or above shoulder level on the affected side.  Lifting/carrying/pushing/pulling should be limited to 10 pounds or less occasionally.  She should be able to shift positions when seated and have 2-3 minute "stand and stretch" periods at least every hour in addition to standard morning, afternoon and lunch breaks.  There is no detailed description of elbow, hand or wrist impairments and constant handling, feeling, fine fingering and grasping should be possible.

(*Id.* at PageID.777.)  MetLife sent Dr. Peters's report to Dr. Salamon and requested his comments.

However, Dr. Salamon never responded.  (*Id.* at PageID.751, 772.)

On December 15, 2014, MetLife sent Black a letter notifying her of MetLife's decision to terminate her LTD benefits because the medical information showed that Black no longer met the definition of disability.  In its letter, MetLife cited certain medical records indicating improvement in Black's medical impairments, as well as Dr. Peters's report.  Met Life also informed Black of her right to appeal the decision, and noted that although Black had obtained Social Security Disability benefits, the award of such benefits was a separate determination governed by different standards. (*Id.* at PageID.749–752.)  On December 31, 2014, Dr. Salamon submitted an Attending Physician's Statement to MetLife stating that Black could not return to work. (*Id.* at PageID.743.)

## E.      Black's Appeal of MetLife's Decision

On June 15, 2015, Black filed an appeal with MetLife and submitted additional medical records and notes from physical therapy.  (ECF No. 9-2 at PageID.691–730.)  In connection with the appeal, MetLife referred Black's claim file to Robert H. Bolt, M.D., an independent physician consultant (IPC) board-certified in orthopedic surgery, for his opinion on Black's restrictions and limitations.  Dr. Bolt issued an initial report and two supplemental reports.

In his initial report, dated February 16, 2015, Dr. Bolt conducted an extensive review of Black's medical file spanning 2008, just after the accident, through early 2015, noting her diagnoses of degenerative joint disease bilateral shoulders, degenerative joint disease bilateral knees, cervical spine spondylosis and radiculitis, low back pain secondary to deconditioning, and post traumatic stress disorder.  (ECF No. 9-2 at PageID.671.)  Dr. Bolt noted an August 23, 2013, MRI of Black's cervical spine, which showed multiple level arthropathy that contributed to severe left neuroforaminal narrowing.  He cited, among other records, a March 27, 2014, physical therapy note indicating a 50% reduction in cervical spine pain, significantly improved range of motion, and improvement in activities of daily living; a March 23, 2014, progress report from a visit with Dr.

Salamon stating that, overall, Black was doing better, although she still had pain in her right shoulder, neck, and both knees; and a progress report from an August 25, 2014, visit with Dr. Salamon stating that Black complained of pain in her neck, shoulder, knees and back and that Black had full range of motion in her hip, decreased range of motion in her knees, and "very limited" range of motion in her right shoulder and neck. (*Id.* at PageID.675–77.)  Dr. Bolt referred to the October 21, 2014, Internet Data Investigation report showing that Black was in a graduate program at Benedictine University, had traveled to Chicago for a social event and to Dubai to present a paper at a conference.  Dr. Bolt also noted that on December 3, 2014, Dr. Salamon stated on a MetLife form that Black could sit 1 to 2 hours intermittently with frequent breaks and that she could not climb, twist, bend or stoop, could not push or pull anything, and could not reach above shoulder level with her right shoulder.  (*Id.* at PageID.677–78.)  Dr. Bolt also summarized a telephone conversation with Black's physical therapist:

> Mark Mijnsbergen, Ms. Black [sic] physical therapist, called me back on 2/16/15. We discussed Ms. Black's condition and restrictions and limitations.  He is currently still seeing her, mostly for low back pain at the moment.  He feels that her low back pain is primarily due to deconditioning with spending too much time in bed and sitting in bed.  We discussed arthritis in both of her knees and both of her shoulders, the right shoulder being the major one but the left shoulder is now showing symptoms.  She is making progress with her right shoulder with 160 degrees of elevation with some pain at the end stage.  He feels that there is also an emotional component to her problem.  It took him over a year to coax her back into driving her car which she is doing at the present time for short distances.  There was no physical reason that she couldn't drive.  She acknowledged that she is going to school and traveling.  I asked him what he thought she could do.  His opinion is that she could do sedentary work.  She can sit 30 minutes at a time but would need to stretch and stand for a short break of 3 to 4 minutes.  She can stand 30 minutes at a time and walk 15 minutes at a time.  All the above would be in an 8 hour day.  She could push/pull and lift/carry 0 to 10 lbs. occasionally.  She should not do any above shoulder level activities.  There would be no restriction on repetitive reaching at desk level or repetitive use of the upper extremity/hand/fingers for grasp and fingering.

(*Id.* at PageID678–79.)  Dr. Bolt attempted to contact Drs. Salamon and Neuenschwander but was unsuccessful.  Dr. Bolt concluded that Black could do sedentary work and there was insufficient

medical evidence to impose limitations on the use of her elbow, hand, and wrist.  Dr. Bolt adopted

the restrictions given by Black's physical therapist, with the addition of no walking on uneven

ground or working above ground level, no stooping, kneeling, and crawling, and no repetitive stair

climbing.  (*Id.* at PageID.680.)

Met Life sent Dr. Bolt's report to Drs. Salamon and Neuschwander for their comments.  Dr.

Salamon did not provide comments, but Dr. Neuenschwander responded in a March 5, 2015 letter.

Dr. Neuenschwander opined that "Sherri is not ready now, nor will she ever be ready, to return to

work.  Her orthopedist, Dr. Salamon, has made this clear in his report from last summer as well as

from December 2014."  (ECF No. 9-2 at PageID.635.)  Dr. Neuenschwander also said that Black

"is in constant pain, is unable to drive, has problems with focus and concentration, and is constantly

fatigued."  He added, "Her job requires her ability to handle stress for 10-12 hours per day, to walk

and climb stairs, to make decisions on the fly, and to manage a computer. . . . Sherri is clearly

disabled and will not every [sic] be

able to return to work."  (*Id.* at PageID.637.)

On March 24, 2015, Dr. Bolt issued a supplemental report based on information in Dr.

Neuenschwander's letter.  Dr. Bolt wrote:

> I agree with Dr. Neuenschander [sic] that Ms. Black's job description implies a lot
> of walking and stair climbing because of her need to travel to other plants.  I
> restricted her to climbing stairs only rarely.  No stair climbing seems unreasonable
> as she does go to school, only if on a once per month basis, and she was also
> scheduled to present a paper in Dubai.  This must at least involve some stair
> climbing.  The physical therapist who saw Ms. Black multiple times suggests that
> she spends too much time in bed and is, therefore, very deconditioned.  Dr.
> Neuenschander [sic] paints a picture of a patient who is bedridden.  I am going on
> the information that I received from the therapist at that time.  However, Dr.
> Neuenschander [sic] does change my opinion some and please see below.
>
> I was asked how many hours in an 8 hour day the claimant can sit, stand and walk.
> I think she can sit 2 hours cumulatively in an 8 hour day, stand and walk no more
> than 2 hours cumulatively in an 8 hour day.  This adds up to no more than 4 hours

in an 8 hour day and, therefore, would be, at best, a 4 hour work day with the above restrictions. Missing from this report are clinical records from Dr. Neuenschander [sic] and Dr. Soloman's [sic] response to my report which apparently is pending. My opinion could change especially if Dr. Soloman [sic] responds to my report.

(ECF No. 9-1 at PageID.624.)

In April 2015, MetLife received information concerning the requirements of the doctoral program in which Black was enrolled at Benedictine University, along with Black's transcripts, which showed that Black had a 4.0 grade point average. The course information required attendance one weekend a month at Benedictine University's Lisle, Illinois campus, with class times from 6:30–9:30 p.m. on Friday evening and 9:00 a.m.–4:00 p.m. on Saturday and Sunday. In addition, participants were required to attend an annual 8-day intensive, from 8:00 a.m.–5:00 p.m. each day, and to attend a global exchange at least once during the program. The program could not be completed online. (ECF No. 9-1 at PageID.616–18.) MetLife provided this information to Dr. Bolt for his consideration.

On April 29, 2015, Dr. Bolt issued his second supplemental report based on new information from MetLife. Dr. Bolt stated:

> This [new information] does change my opinion. It states fairly clearly what is required of Ms. Black and, since she is getting a 4.0 GPA, she must be following those requirements. From this description it appears that Mrs. Black can sit unlimited in an 8 hour day. She should be able to change positions as needed to standing and stretching for 5 to 10 minutes. As far as standing and walking is concerned, I feel that she does have some limitations and could stand and walk no more than 2 hour [sic] cumulatively in an 8 hour day but total work time could add up to 8 hours. I reviewed the Diary Notes hoping to find a recent conversation with Ms. Black where she described exactly what she does for her classes but that did not appear to be available. Also missing from the record are clinical reports from Dr. Neuschwander [sic] and Dr. Salamon's response to my report which is still pending. My opinion could change if some of these records/responses become available.

(ECF No. 9-1 at PageID.597–98.) Thereafter, MetLife requested Susan M. Sineni, MS, CRC, LCPC, Vocational Rehabilitation Consultant (VRC), to prepare an Employability Assessment Labor

Market Analysis to identify occupations that Black could perform within her restrictions and limitations.  Sineni identified three sedentary jobs that Black could perform given her education, training, experience, restrictions, and limitations: (1) Human Resource Manager ($62.37/hour; (2) Budget Officer ($50.71/hour); and (3) Employment Manager ($62.37/hour).[3]  (ECF No. 9-1 at pageID.589–96.)

On May 6, 2015, MetLife sent Black a letter notifying her of its decision to uphold its previous decision to terminate Black's LTD benefits and deny her appeal. (ECF No. 9-1.)  MetLife explained that its conclusion that, although Black had some restrictions and limitations, such restrictions and limitations would not have prevented Black from performing "any gainful occupation for which [she was] reasonably qualified, taking into account [her] training, education and experience, as defined by the Plan." (*Id.* at PageID.577.)  MetLife set forth the information Black had provided in support of her appeal that MetLife had considered, and described the IPC's (Dr. Bolt's) review of the medical records in Black's claim file.  MetLife explained that the IPC had spoken with Black's physical therapist and received and considered his input and had requested a response from Dr. Salamon, but Dr. Salamon did not provide any input.  However, MetLife noted that it had received and considered a response from Dr. Neuenschwander. (*Id.* at PageID.578–80.)  MetLife further explained that a VRC had identified three sedentary jobs existing within Black's geographical area that Black could perform.  Finally, MetLife also said that it considered the fact that Black was receiving SSDI benefits, but it had determined that Black's medical conditions had improved sufficiently by December 15, 2014, to allow Black to perform any gainful occupation under the Plan.  In sum, MetLife explained:

---

[3]Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967.

You stated that you could not perform a job because you could not be up for more than a few hours before you had to rest.  Dr. Neuschwander [sic] stated you were in constant pain, unable to drive, had problems with focus and concentration, constantly fatigued, and spent days in bed recovering if you did anything.  However, based on the above, you have been in Graduate School since the spring of 2013, have earned a 4.0 GPA, and taken between 6-8 credit hours per semester.  The above activity does not corroborate with the severity of your limitations reported.  Our review that included a Board Certified IPC, found that although you would have some restrictions and limitations, the restrictions/limitations would not prevent you from performing a sedentary position as of December 15, 2014 forward.

(*Id.* at PageID.581–82.)

Black thereafter filed the instant action seeking review of MetLife's decision.

## II. DISCUSSION

### *Standard of Review*

Generally, in an ERISA case, a court reviews a denial of benefits *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); *see also Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998). The parties dispute the appropriate standard of review.  MetLife argues that the Plan contains the requisite grant of discretionary authority to MetLife to trigger application of the arbitrary and capricious review.  MetLife relies on the following language: "For plans covered under an insurance policy (e.g., HMOs, Life insurance, etc.), the carrier has been delegated discretionary authority to construe, interpret, apply and administer the Program.  Any such interpretation or determination is final and binding subject only to the arbitrary and capricious standard of review." (ECF No. 8-2 at PageID.85.)  Black, on the other hand, argues that the appropriate standard of review is *de novo*, based on Michigan Administrative Code Rule 500.2202(b), which prohibits provisions granting discretionary authority to insurance companies in group insurance policies issued after July 1, 2007.

Black argues that this Michigan insurance rule precludes application of any discretionary clause in the Policy.

Central to the parties' dispute in the instant case is this Court's decision in *Markey-Shanks v. Metropolitan Life Insurance Co.*, No. 1:12-CV-342, 2013 WL 3818838 (W.D. Mich. July 23, 2013). In *Markey-Shanks*, this Court was required to determine whether Rule 500.2202(b) precluded application of a discretionary clause in a MetLife policy. The Court concluded that Rule 550.2202(b) did not prohibit application of the discretionary clause because the MetLife Policy at issue was issued prior to July 1, 2007, and had not been amended after that date. The Court also found no legal basis for the plaintiff's estoppel argument. *Id.* at \*6. In addition, the Court noted MetLife's statement to the Michigan Insurance Commissioner that for ERISA plans funded by MetLife insurance policies, MetLife would continue to adhere to the terms of summary plan descriptions required by ERISA and that such documents are regulated by the United States Department of Labor rather than state insurance regulators. *Id.* This Court reasoned:

> In the instant case, the discretionary clause is contained not in the Policy, but in the ERISA plan document itself, which is not subject to regulation by the Commissioner. In this regard, the administrative rules that Markey-Shanks cites apply only to insurance policies and other documents subject to approval by the Commissioner. A "'[d]iscretionary clause' is a provision in a form that purports to bind the claimant or to grant deference in subsequent proceedings to the insurer's decision . . . ." Mich. Admin. Code Rule 500.2201(c). A "form is "a form identified in MCL 500.2236(1)." Mich. Admin. Code Rule 500.2201(d). Section 500.223 6(1), in turn, provides that an insurer may not issue an insurance policy, application form, rider, indorsement, renewal certificate, or group certificate in Michigan until the Commissioner approves the form. An ERISA Plan or SPD is not among the documents subject to review by the Commissioner. . . . the plain language of Rules 500.2201 and 500.2202 thus makes clear that they do not apply to ERISA SPDs and other plan documents subject to federal regulation.

*Id.* at \*6.

Although the above-quoted discussion was not necessary to this Court's decision in *Markey-Shanks*, some district courts within the Sixth Circuit have adopted this Court's reasoning. *See Rose*

*v. Liberty Life Assurance Co. of Boston*, No. 3:15-cv-28, 2016 WL 1178801, at \*3 (W.D. Ky. Mar. 23, 2016); *Hess v. Metro. Life Ins. Co.*, 91 F. Supp. 2d 895, 901–02 (E.D. Mich. 2015).  The Court notes, however, that in *Fontaine v. Metropolitan Life Insurance Co.*, 800 F.3d 883 (7th Cir. 2015), the Seventh Circuit, confronted with a similar insurance regulation under Illinois law, rejected as "too clever, and without merit" MetLife's argument that the discretionary clause was contained not in an insurance document subject to regulation by the State of Illinois, but was in an ERISA plan document that was beyond the reach of the state insurance regulation.  *Id.* at 887.  The court reasoned that such argument "would virtually read the saving clause out of ERISA" and would "nullify the evident purpose of [the Illinois regulation]."  *Id.* at 891–92 (internal quotation marks omitted).

This Court need not revisit *Markey-Shanks* or apply its reasoning, as MetLife asserts, because MetLife's decision should be affirmed even under a *de novo* standard of review.  In conducting a *de novo* review of a denial of benefits, a court considers only the materials contained in the administrative record.  *See Wilkins*, 150 F.3d at 619.  "When applying a *de novo* standard in the ERISA context, the role of the court reviewing a denial of benefits is to determine whether the administrator made a correct decision.  The administrator's decision is accorded no deference or presumption of correctness."  *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 808-09 (6th Cir. 2002) (internal quotations and citation omitted).  This standard applies to both factual and legal determinations by a plan administrator.  *Rowan v. Unum Life Ins. Co. of Am.*, 119 F.3d 433, 435 (6th Cir.1997).

### *Claim for Benefits*

The Policy required Black to submit proof, satisfactory to MetLife, that she continued to be disabled not just from performing the duties of her prior occupation with Visteon, but "any gainful occupation for which [she was] reasonably qualified taking into account [her] training, education,

and experience."  Pursuant to this provision, Black had the burden of proving that she continued to be disabled; MetLife was not obligated to prove that Black was not disabled.  *Nicolai v. Aetna Life Ins. Co.*, No. 08-CV-14626, 2010 WL 2231892, at *6 (E.D. Mich. June 3, 2010) (citing *Donatiello v. Hartford Life & Accident Ins. Co.*, 344 F. Supp. 2d 575, 580 (E.D. Mich. 2004)).

The administrative record in this case leaves no doubt that the 2008 accident exacerbated preexisting conditions that Black had in her knees, right shoulder, and neck and that these injuries caused her pain which precluded her from performing the duties of her position at Visteon.  There is also no question that Black continued to suffer from the pain and effects of her injuries over the next several years.  The question for this Court, however, is whether Black's functional capacity showed improvement to the point that she was able to perform the duties of a sedentary occupation at the time MetLife terminated her benefits.  The evidence MetLife received in 2014, and in 2015 after Black appealed MetLife's initial denial, showed that Black's physical condition had in fact improved sufficiently to allow her to perform sedentary work.  That evidence  included:

- A May 23, 2014, progress report indicating that Black had shown improvement, was walking better, and had increased range of motion in her right shoulder and good movement in her knees.  (ECF No. 9-4 at PageID.833.)
- A March 9, 2014, report from Black's physical therapist indicating that Black's cervical pain was reduced by 50%, her cervical and right shoulder mobility had improved, and Black was making "slow but consistent progress in all aspects." (*Id.* at PageID.817.)
- Physical therapy notes from May 20, 2014, through July 24, 2014, stating that Black was showing good tolerance and was slowly improving, and her shoulder was progressing well. (*Id.* at PageID.819.)
- An Internet Data Investigation Report showing that Black was active both socially—for instance, having traveled to Chicago for dinner—and educationally—she was enrolled in a doctoral program at Benedictine University in Illinois and, in connection with that program, traveled to Dubai to present a paper at a conference.
- An opinion from Black's physical therapist that Black could do sedentary work, with some limitations. (ECF No. 9-2 at PageIC678–79.)
- Information regarding the course and attendance requirements for the doctoral program in which Black was enrolled, including her transcripts showing that she had a 4.0 GPA.

- An opinion from an IPC board-certified in orthopedic surgery, that Black could perform sedentary work, with restrictions.

The totality of this evidence supports MetLife's decision.

Black argues that MetLife's reliance on the attendance requirements of the Benedictine doctoral program—full days at least one weekend per month—and Black's trip to Dubai as part of that program to conclude that Black is not disabled from performing full-time work is "absurd" because the number of days Black spent attending class (approximately 56 per year) is much less than the approximately 250 days per year that Black would be required to spend at full-time employment. While Black is correct that her attendance at the doctoral program cannot be equated to full-time work, her class attendance (as well as the out-of-class work she did toward completion of that program) is still material to whether she was disabled. First, her participation in the program, including travel to Illinois and attendance of classes at least one weekend per month, shows that she was not as limited as she claimed. For example, in her January 15, 2015, letter to MetLife, Black said that she could not "be up for more than a few hours and must rest . . . [and was] in constant pain." (*Id.* at PageID.691.) The fact that Black was able to travel several hours and sit through day-long classes shows that Black was not as limited as she claimed. Second, the fact that Black was able to earn and maintain a 4.0 GPA in a doctoral program—certainly no easy feat—undermines Dr. Neuenschwander's opinion that Black suffered from "extreme fatigue, easy fatigability [sic], brain dysfunction (consistent with traumatic brain injury) and PTSD symptoms." (*Id.* at PageID.637.)

As for medical opinions, Dr. Peters, MetLife's Senior Medical Director, and Dr. Bolt, an independent consultant whom MetLife retained to review Black's medical file and offer an opinion on her functional limitations, both said that Black could perform sedentary (seated) work, with the ability to frequently change positions as needed and stand and stretch. On the other hand, Dr. Salamon and, to a more limited extent, Dr. Neuenschwander, treated Black on a regular basis since

the 2008 accident, had physically examined her on numerous occasions, and both opined that Black would not be able to return to work.  Dr. Bolt attempted to speak with Dr. Salamon and Dr. Neuenschwander but was unable to contact them.  Dr. Bolt sought input from Dr. Salamon regarding Dr. Bolt's report, but Dr. Salamon never responded to Dr. Bolt's report.  Dr. Neuenschwander did respond to Dr. Bolt's report, opining that Black could never return to work.  (ECF No. 9-1 at pageID.635.)

Black argues that the Sixth Circuit's decisions in *Hoover v. Provident Life and Accident Insurance Co.*, 290 F.3d 801 (6th Cir. 2002), *Calvert v. Firstar Finance, Inc.*, 409 F.3d 289 (6th Cir. 2005), and *Kalish v. Liberty Mutual/Life Assurance Co. of Boston*, 419 F.3d 501 (6th Cir. 2005), show that the Sixth Circuit prefers the opinions of treating physicians to long-distance records reviewers who do not examine the plaintiff and that the opinions of Black's physicians must therefore be accepted as more persuasive.[4]  In *Hoover*, the court concluded that the insurer's decision to accept the opinions of its own physicians, who had not examined the plaintiff and only reviewed her medical records, over the opinion of the plaintiff's treating physician to deny benefits was incorrect.  *Hoover*, 290 F.3d at 809.  In *Calvert*, the court said that an insurer's "reliance on a file review does not, standing alone, require the conclusion that [the insurer] acted improperly," although it noted that "the failure to conduct a physical examination—especially where the right to do so is specifically reserved in the plan—may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert*, 409 F.3d at 295.  The court also confirmed that it found "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination." *Id.* at 296.  Similarly, consistent with *Calvert*, the court in *Kalish* said that whether a doctor physically examined a claimant—as opposed to

---

[4]The applicable standard of review in *Hoover* was *de novo*, *Hoover*, 290 F.3d at 808, while in *Calvert* and *Kalish* it was arbitrary and capricious.  *Calvert*, 409 F.3d at 295; *Kalish*, 419 F.3d at 506.

conducting only a file review—is one factor bearing on a court's analysis of whether a plan administrator acted arbitrarily and capriciously in denying benefits. *Kalish*, 419 F.3d at 508.

While the instant case is similar to *Hoover* in that Dr. Bolt did not examine Black, there are two important distinctions. First, as noted above, there is evidence indicating that Black's functional abilities were not as limited as Black and her physicians reported. Second, and more importantly in this Court's view, is that Dr. Bolt interviewed, and relied on the opinion of, Black's physical therapist, Mr. Mijnsbergen, who opined that Black could perform sedentary work with restrictions. At the time Dr. Bolt spoke to Mr. Mijnsbergen, Mr. Mijnsbergen had been working with Black for at least a year, at least once (or more) per week. Mr. Mijnsbergen administered Black's physical rehabilitation and, based on his work with, and observations of, Black, was probably the most knowledgeable of Black's providers about her functional abilities and limitations at the time.

Black also argues that Dr. Bolt's opinion is flawed because MetLife apparently persuaded Dr. Bolt to change it by sending Dr. Bolt the program requirements for the doctoral program at Benedictine University. Initially, Dr. Bolt concluded that Black could do sedentary work for an eight-hour day, but after receiving Dr. Neuenschwander's March 5, 2015, letter, Dr. Bolt amended his opinion to provide that Black could perform sedentary work only four hours per day. (ECF No. 9-1 at PageID.624.) Subsequently, after MetLife sent him the requirements of the Benedictine University doctoral program, Dr. Bolt changed his opinion a second time to conclude that Black could work an eight-hour day. Black suggests that Dr. Bolt changed his opinion to satisfy MetLife. But, there is no indication that Dr. Bolt was previously aware of the course requirements for the doctoral program, and it appears that Dr. Neuenschwander may not have understood them, as he stated his letter to Dr. Bolt that Black did her classwork "in her hospital bed at home on her own

18

schedule." (*Id.* at PageID.)  Dr. Bolt very well may have relied on this erroneous statement from

Dr. Neuenschwander in amending his opinion the first time.[5]

Black also argues that because the Policy authorized MetLife to have a claimant undergo an

independent medical examination and a functional capacity evaluation, MetLife's failure to have

Black submit to such examinations weighs against affirming MetLife's decision.  However, as noted

above, Black had the burden of proving that she continued to be disabled under the Policy, and thus

was required to support her claim that her impairments prevented her from working.  *See Kiel v. Life

Ins. Co. of N. Am.*, 345 F. App'x 52, 58 (6th Cir. 2009) (noting that the plaintiff's argument that the

insurer could have conducted its own test ignored that the plaintiff had the burden of proving

continuing disability); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 985–86 (6th Cir. 1991) (holding

that a plaintiff in an ERISA case bears the burden of proving continuing disability and that such

burden continues to lie with the employee after benefits are initially conferred).  Accordingly,

because Black bore the burden of proving disability, MetLife was not obligated to arrange an

independent medical examination or a functional capacity evaluation.

### III. CONCLUSION

For the foregoing reasons, the Court will grant MetLife's motion for judgment on the

administrative record and deny Black's motion for judgment on the administrative record.

An Order consistent with this Opinion will be entered.

Dated:  March 21, 2017                    /s/ Gordon J. Quist
                                          GORDON J. QUIST
                                          UNITED STATES DISTRICT JUDGE

---

[5]The Court also notes that Dr. Bolt and Dr. Neuenschwander both erroneously referenced the description of Black's position at Visteon.  The relevant inquiry, however, was whether Black could perform *any gainful occupation* for which she was reasonably qualified.  The requirements of Black's position at Visteon thus had no bearing on whether Black remained disabled under the Policy.